UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

-against-

GEORGE ALPHONSON HOLMES,

                                    Defendant.
_____

**MEMORANDUM & ORDER**
**21-CR-147 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant George Holmes, a noncitizen from Jamaica, is charged with one count of illegal reentry in violation of 8 U.S.C. §§ 1326(a) and (b)(2). (*See* Indictment (Dkt. 8).) Section 1326(a) makes it a crime for a person who "has been denied admission, excluded, deported, or removed" from the United States to reenter the country. 18 U.S.C. § 1326(a). An element of this crime is a defendant's administrative removal order. Thus, the charge against Holmes turns on the validity of his prior removal order. (*See* Final Administrative Removal Order (Dkt. 15-3) at ECF p. 42.)

Holmes now moves to dismiss the indictment, attacking the removal order as invalid. He argues that the immigration judge erroneously concluded that his state convictions supporting removal were aggravated felonies, thus precluding Holmes from seeking, or being considered for, any form of relief from removal. He contends this was a prejudicial procedural error that altered the outcome of his removal proceeding, rendering his removal order invalid.

For the reasons explained below, the court agrees with Holmes and finds the underlying removal order invalid. Thus, it cannot support a charge of illegal reentry. Holmes's motion is therefore GRANTED, and the Indictment is DISMISSED.

## I.  BACKGROUND

George Holmes was born in Jamaica in 1969. He came to the United States at an early age, when he was either about ten months old, or four years old. The Immigration and Naturalization Service ("INS") has no record of his entry. Holmes's father was a U.S. citizen; his mother was a lawful resident. In time, Holmes married a U.S. citizen, and they had four children in the United States. Despite his family's status and his longstanding residency in the United States, Holmes never obtained legal immigration status.

In 1992, Holmes was convicted of attempted criminal sale of a controlled substance in the third degree under New York Penal Law ("N.Y.P.L.") §§ 110.00, 220.39(1). He received a sentence of one day in jail and five years of probation. In 1999, he was convicted for possession of a controlled substance in the third degree under N.Y.P.L. § 220.16(1).[1]  According to court records, the 1992 conviction involved "crack/cocaine," and the 1999 conviction involved cocaine.

Although Holmes received a five-to-ten-year sentence for the 1999 conviction, he was accepted into New York's SHOCK Incarceration program at the Lakeview Correctional facility—a selective six-month program that provides an alternative to incarceration aimed at rehabilitation. During this program, the INS identified Holmes as a removable noncitizen, lodged a detainer with Lakeview, and prepared an administrative warrant for Holmes's arrest. In addition, the INS prepared a Form I-862, the "Notice to Appear," charging Holmes with removability based on his unlawful status and his criminal history.

---

[1] Between these drug charges, in 1997, Holmes pleaded guilty to attempted assault in the third degree in violation of N.Y.P.L. § 120.00, for which he was sentenced to a conditional discharge.

At the end of the SHOCK program, on March 23, 2000, the INS took custody of Holmes. He was served a Form I-286, a "Notice of Custody Determination," informing him that he would be detained pending the immigration court's final determination of his case. The INS then filed the Notice to Appear with the immigration court in Batavia, New York. After additional filings, on April 4, the immigration court produced a notice to Holmes, informing him of an April 12, 2000 removal hearing.

### A. First Removal Hearing: April 12, 2000

Holmes appeared *pro se* for his removal hearing before an immigration judge ("IJ") on April 12, 2000. The INS alleged Holmes was removable on three grounds: (1) being present without having been lawfully admitted or paroled, 8 U.S.C. § 1182(a)(6)(A)(i); (2) having been convicted of offenses "relating to a controlled substance (as defined in . . . 21 U.S.C. [§] 802)," 8 U.S.C. § 1182(A)(2)(A)(i)(II); and (3) being an "alien who the . . . Attorney General knows or has reasons to believe . . . is or has been an illicit trafficker in any controlled substance or any listed chemical (as defined in . . . 21 U.S.C. [§] 802)," 8 U.S.C. § 1182(a)(2)(C). (*See also* Ex. G to Wheeler Decl., Removal Hr'g, Tape 1, GAH000274, at 5:40 - 6:15.) The second and third drug-related removability charges were based on Holmes's 1992 and 1999 state convictions.

As the IJ reviewed these allegations, Holmes expressed disagreement about the record regarding his 1992 conviction. This prompted the IJ to advise Holmes to retain an attorney to review the allegations against him. But Holmes declined.

During the back-and-forth that followed, Holmes told the IJ, "[t]his man want to know what kind of waiver this man here

got."[2] (*Id.* at 7:32.) Again, the IJ responded by formally advising Holmes of his right to an attorney and offering Holmes an adjournment so that he may exercise that right. (*Id.* at 7:40 - 8:00.) Again, Holmes declined.

Holmes then expressed his desire to proceed. The IJ asked him to explain his earlier disagreement about his 1992 conviction. Rather than respond to the IJ's question, Holmes stated that "all my family is here. My wife, my kids, and everybody's here," and repeated that "[t]his man want to know what kind of rights he got, what kind of waiver, what kind of rights he got." (*Id.* at 8:11 - 8:23.)

The questioning that followed focused on Holmes's alienage. He expressed not knowing whether he was ever granted lawful residency; he knew only that he had "been here all his life," or at least since he was four years old. (*Id.* at 9:00.) Because of this confusion, the IJ broke down the situation for Holmes:

> IJ: Basically the government is saying that they have no record of you being here legally. If that is true, then you have no right to be here.
>
> . . . .
>
> IJ: If you have a drug conviction and you're not a citizen of the United States, you have no right to be here. And if, and if your conviction is for attempted criminal sale, and it's a final conviction, and you're not a citizen of the United States, there would be absolutely no relief for you because that is considered to be an "aggravated felony."

(*Id.* at 9:21 - 10:08.) The IJ then suggested Holmes take an adjournment and retain a lawyer to determine his status. (*Id.* at 10:17.) Holmes countered by asking whether he could receive

---

[2] Throughout the hearing, and to the initial confusion of the IJ, Holmes referred to himself in the third person, as "this man." Holmes learned this technique in the bootcamp-styled SHOCK program.

bail. At this point, the IJ paused the removal hearing, went off the record, and conducted a bond hearing (a separate proceeding), where the IJ found Holmes subject to mandatory detention based on his criminal convictions pursuant to 8 U.S.C. § 1226(c).

After the bond hearing, the IJ again urged Holmes to request an adjournment and speak with a lawyer to review the allegations. (*Id.* at 10:58 - 11:22.) Holmes objected, asking whether he "can't get a bail or nothing?" (*Id.* at 11:30.) The IJ reiterated his determination that Holmes was subject to detention. Holmes thus requested to "sign out right now," (*id.* at 11:45), prompting the IJ to explain  the rights that Holmes would be afforded at this hearing, (*id.* at 12:02 - 12:54).

Continuing with the hearing, the IJ again asked Holmes whether he was a citizen of the United States. Holmes again explained that he did not know; he was told he was born in Brooklyn; he's been here all is life. (*Id.* at 13:05 - 13:17.) The IJ took Holmes's responses as a denial of the removability allegations. (*Id.* at 14:18 - 14:26.) In the ensuing exchange, Holmes again asked to "sign out" to avoid further proceedings and return to Jamaica. (*Id.* at 15:00 - 15:15.) But because of Holmes's responses regarding alienage, the IJ ordered a factual hearing focused on that subject for May 12, 2000. (*Id.* at 15:16 - 15:20, 16:26 - 16:30, 17:10 - 17:26.)

Holmes objected to a continuance, emphasizing his desire to move forward. He said that, because he's "not eligible for no bail or nothing," he "just want[s] to move on"; he wished "to sign out" and return to Jamaica. (*Id.* at 18:15 - 18:30.) Over Holmes's objection, the IJ adjourned the hearing.

### B.   Second Removal Hearing: May 12, 2000

Holmes again appeared *pro se* for his removal hearing on May 12, 2000. But this time he conceded (based on a conversation with his mother) that he was not born in Brooklyn, and he was

not a U.S. citizen. He also conceded that he had been convicted of the 1992 and 1999 drug offenses as alleged in the Notice to Appear. Holmes reviewed the evidence submitted in support of removal, asked the IJ limited questions about his charges (which the IJ answered), and then consented to the IJ considering that evidence in making his decision.

With this consent, the IJ dictated his decision. (*Id.* at 32:45.) First, the IJ determined Holmes had not met his burden to establish a prior lawful admission and found him removable as charged in the Notice to Appear. (*Id.* at 42:10 - 44:59.) The IJ held:

> IJ: For relief purposes, the respondent would be considered an aggravated felon. Section 101(a)(43)(B) of the Act—
>
> Holmes: Sir—
>
> IJ: —would make the respondent an aggravated felon drug trafficker. Each of the respondent's convictions in 1992 and 1999 would qualify under that section. . . . Since the respondent, for relief purposes, is considered an aggravated felon, he would be statutorily ineligible for any form of relief from removal under this Act. See section 240A of the Act and section 240B of the Act, each of which indicate that a person cannot qualify for either cancellation of removal or voluntary departure if he is considered to be an aggravated felon.[3]

(*Id.* at Tape 2, GAH000275, at 01:48 - 03:03.) The IJ then ordered Holmes's removal to Jamaica.

Holmes, however, explaining his interjection, rejected that his 1999 conviction involved an intent to sell. (*Id.* at 3:56 - 4:11.) The IJ explained that the 1999 conviction record showed that he

---

[3] INA section 101(a)(43)(B) is codified at 8 U.S.C. § 1101(a)(43)(B). Sections 240A and 240B are codified at 8 U.S.C. §§ 1229b, 1229c, respectively.

pleaded guilty to N.Y.P.L. § 220.16(1), which punishes possession with intent to sell; and, in any event, the 1992 conviction was for attempted criminal sale, meaning that even a mere "simple possession" charge in 1999, following the 1992 criminal sale conviction, would render Holmes an aggravated felon.  (*Id.* at 4:30 - 5:46**.)**

The IJ thus reaffirmed that Holmes, despite the presence of his wife and four kids, was removable because of his drug convictions:

> IJ: I have found that you are removable from the United States. I have found that because of your drug convictions, even though you have a wife and four children in the United States, there is no relief which is available to you and I have therefore ordered that you be removed from the United States to Jamaica.

(*Id.* at 5:52 - 6:13.) The IJ then notified Holmes that if he disagreed with the IJ's decision, he may appeal it to the Board of Immigration Appeals ("BIA"). (*Id.* at 06:18 - 6:23.) After explaining this right, the IJ offered Holmes the choice to either appeal or accept the IJ's decision as final. Holmes stated that he did not wish to appeal; he "wanted to waive [his] rights" and expressly accepted the IJ's decision as final. (*Id.* at 6:32 - 6:45.)

With that waiver, the IJ cautioned Holmes on the consequences of removal. (*Id.* at 7:15.) The IJ explained that he could not return to the United States without a special waiver, that he could not lawfully reside in the United States, and, if he did return without permission, that he would be subject to criminal prosecution. (*Id.* at 7:40 - 7:59.)

This cautionary closing prompted Holmes to ask the IJ for clarification about future lawful immigration:

> Holmes: Sir, sir, why can't I come back after a certain amount of time, like 20 years after? I got my family here—my kids here, my wife here, my mother here, she will probably die—
>
> . . . .
>
> IJ: Under the present law, because of you have drug convictions you cannot come to the United States unless you apply for a waiver. You have to get special permission to come back—
>
> Holmes: Oh, I could apply again back, for a waiver?
>
> IJ: You can apply for a waiver and if the waiver is granted to you, then you can enter as a visitor on the terms of the waiver. But . . . if you try to come here without getting the waiver you can spend 20 years in jail.

(*Id.* at 08:07 - 9:20.) Following that exchange, the hearing concluded, and the IJ issued a short-form order of removal to Jamaica. (Ex. J to Wheeler Decl. (Dkt. 15-3) at ECF pp. 53-55.) Holmes did not petition the BIA for review of his removal order, and he was deported to Jamaica just over a month later on June 19, 2000.

### C.   Return to the United States

After Holmes's removal, he unlawfully returned to the United States. On February 22, 2021, an arrest warrant was issued for Holmes. On March 2, 2021, he was arraigned and released on bond. On March 22, 2021, the Government filed an indictment charging Holmes with one count of illegal reentry in violation of 8 U.S.C. §§ 1326(a) and (b)(2). Holmes now moves to dismiss the indictment on the ground that his previous deportation was invalid. (Not. of Mot. to Dismiss (Dkt. 15); Def.'s Mot. to Dismiss ("Mot.") (Dkt. 15-1).) The Government opposes that motion. (Gov't Opp. to Mot. to Dismiss ("Opp.") (Dkt. 20).) The court held oral argument on March 9, 2022.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 12 "authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds." *United States v. Ahmed*, 94 F. Supp. 3d 394, 404 (E.D.N.Y. 2015).[4] "An element of the offense of illegal reentry after deportation or removal in violation of 8 U.S.C. § 1326 is that the defendant was previously deported in such a manner that complied with due process." *United States v. Taveras*, 504 F. Supp. 3d 272, 278 (S.D.N.Y. 2020). A noncitizen charged with illegal reentry may collaterally attack the validity of the underlying removal order if (1) the defendant has exhausted administrative remedies, (2) the removal proceedings "deprived the alien of the opportunity for judicial review," and (3) "the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). Each of the statute's three requirements must be satisfied. *See United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1620-21 (2021).

In *Palomar-Santiago*, the Supreme Court rejected the Ninth Circuit's rule excusing defendants "from proving the first two requirements of § 1326(d) if they were not convicted of an offense that made them removable," because "the substantive validity of the removal order is quite distinct from whether the noncitizen exhausted his administrative remedies . . . or was deprived of the opportunity for judicial review." *Id.* at 1620-21. "But the Court didn't consider the effect of an invalid appeal waiver on an alien's burden to prove the first two prongs of § 1326(d)." *United States v. Herrera-Pagoada*, 14 F.4th 311, 320 n.8 (4th Cir. 2021). Accordingly, longstanding Second Circuit precedent remains good law: "A failure to exhaust administrative remedies bars collateral review of a deportation

---

[4] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

proceeding under Section 1326(d)(1) . . . only where an alien's waiver of administrative review was knowing and intelligent." *United States v. Calderon*, 391 F.3d 370, 374-75 (2d Cir. 2004) (reasoning that a failure to "excuse the administrative exhaustion requirement under such circumstances" "would offend the principles enunciated in *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987)"); *United States v. Gutierrez-Campos*, No. 21-CR-40 (JPC), 2022 WL 281582, at *19 (S.D.N.Y. Jan. 31, 2022); *United States v. Ramos de la Rosa*, No. 21-CR-210 (JSR), 2021 WL 2784610, at *2 (S.D.N.Y. July 1, 2021) (Rakoff, J.) (applying the knowing and intelligent waiver rule to the administrative exhaustion requirement and finding that the requirement was excused because the defendant's "waiver of his right to appeal was likely not knowing and intelligent").

## III. DISCUSSION

Holmes moves to dismiss the indictment by collateral attack on the underlying removal order. Although § 1326(d) lists the fundamental unfairness factor third, it presents the greatest hurdle to Holmes and shapes his overall argument that (1) the IJ erroneously found, and informed Holmes, that his underlying state convictions constituted aggravated felonies, and, (2) as a result, the IJ precluded him from (a) seeking relief from removal by voluntary departure and (b) making a knowing and intelligent waiver of his right to appeal.

Accordingly, the court first considers fundamental unfairness before addressing administrative exhaustion and deprivation of opportunity for judicial review.

### A. Section 1326(d)(3): Fundamental Unfairness

The fundamental unfairness factor requires a two-step demonstration. A defendant "must show both a fundamental procedural error and prejudice resulting from that error." *United States v.*

*Fernandez-Antonia*, 278 F.3d 150, 159 (2d Cir. 2002). The defendant-alien bears the burden of showing fundamental unfairness. *See United States v. Daley*, 702 F.3d 96, 100 (2d Cir. 2012). Holmes satisfies this two-step showing.

### 1.   Fundamental Procedural Error

An IJ commits fundamental error when he advises a noncitizen that he is ineligible for discretionary relief based upon an erroneous interpretation of the law. *See Calderon*, 391 F.3d at 376 ("A failure to advise a potential deportee of a right to seek Section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(d)(3)."); *United States v. Copeland*, 376 F.3d 61, 71 (2d Cir. 2004). Holmes argues that the IJ committed fundamental error when he erroneously advised Holmes that his 1992 and 1999 convictions were aggravated felonies, which precluded Holmes from seeking relief from removal, namely, from the opportunity to seek voluntary departure under 8 U.S.C. § 1229c(a).

### a.   *Voluntary Departure*

"Voluntary departure is a discretionary form of relief that allows certain favored aliens . . . to leave the country willingly." *Dada v. Mukasey*, 554 U.S. 1, 8 (2008). Although a noncitizen who takes voluntary departure must leave the United States, its benefits are clear: "He or she avoids extended detention pending completion of travel arrangements; is allowed to choose when to depart (subject to certain constraints); and can select the country of destination. And . . . by departing voluntarily the alien facilitates the possibility of readmission." *Id.* at 11. Voluntary departure also precludes a future prosecution for illegal reentry because a prior removal order—not a prior departure—is an element of the offense. *See* 8 U.S.C. § 1326(a)(1).

To benefit from this form of relief, a noncitizen must request voluntary departure "prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing." 8 C.F.R. § 1240.26(b)(1)(i)(A). But to even be eligible for voluntary departure, a noncitizen must not have been convicted of an "aggravated felony." 8 U.S.C. § 1229c(a)(1). Applied here, Holmes's motion to dismiss hinges on whether his state convictions constitute aggravated felonies. They do not.

### b.   Aggravated Felony

An "aggravated felony" requires a drug-trafficking offense involving a "controlled substance" listed in the Controlled Substances Act ("CSA"), 21 U.S.C. § 802, which limits the term "controlled substance" to a "drug or other substance" included in one of five federal schedules. *See* 8 U.S.C. § 1101(a)(43)(B). To determine whether Holmes's New York convictions are aggravated felonies, the court must first determine whether N.Y.P.L. §§ 110.00, 220.39(1) and 220.16(1) are divisible. *See Harbin v. Sessions*, 860 F.3d 58, 64 (2d Cir. 2017).

"A divisible statute is one that lists elements in the alternative, and, in doing so, creates a separate crime associated with each alternative element." *Id.* (citing *Mathis v. United States*, 136 S.Ct. 2243, 2249 (2016)). "[A]n indivisible statute creates only a single crime, but it may spell out various factual ways, or means, of committing some component of the offense." *Id.*

N.Y.P.L. §§ 110.00, 220.39(1) provides "that a person is guilty of an attempt to sell or offer to sell a controlled substance in the third degree when he or she intends unlawfully and knowingly to sell or offer to sell a narcotic drug, and engages in conduct to effect that sale or offer." *Austin v. Sessions*, 700 F. App'x 34, 37 (2d Cir. 2017); *see* N.Y.P.L. § 220.39(1) (McKinney 1992) ("A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells . . . (1) a

narcotic drug.").[5] N.Y.P.L. § 220.16(1) provides that "[a] person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses . . . (1) a narcotic drug with intent to sell it." N.Y.P.L. § 220.16(1) (McKinney 1999).

In each statute, "narcotic drug" represents a single element, which may be satisfied in various ways (by various drugs). Thus, the elements of each statute create a single crime. As such, each statute is indivisible. *See Harbin*, 860 F.3d at 66-67 (finding N.Y.P.L. § 220.31 indivisible and noting that "[s]everal cases in the [New York] Appellate Division have considered N.Y.P.L. § 220.16(1), a statute comparable to N.Y.P.L. § 220.31," indivisible); *Austin*, 700 F. App'x at 36 (finding N.Y.P.L. §§ 110.00 and 220.39 indivisible); *United States v. Swinton*, 495 F. Supp. 3d 197, 204-05 (W.D.N.Y. 2020) (finding N.Y.P.L. § 220.39(1) indivisible); *see also Doe v. Sessions*, 886 F.3d 203, 208 (2d Cir. 2018).

Where a defendant previously was convicted under an indivisible state statute, the court must apply the "categorical approach." *See Harbin*, 860 F.3d at 64. "The categorical approach is an element-based analysis that does not take into account the particular facts underlying a conviction." *Id.* An element of a state offense categorically matches its federal counterpart if the state element is "the same as, or narrower than" the federal element. *United*

---

[5] As another court considering § 220.39(1) recently explained, "[t]he Second Circuit in *Pascual v. Holder*, 707 F.3d 403 (2d Cir. 2013), held that the defendant's prior New York state conviction for criminal sale of a controlled substance in the third degree, specifically cocaine, in violation of [N.Y.P.L. §] 220.39(1) . . . constitutes an aggravated felony conviction." *Gutierrez-Campos*, 2022 WL 281582, at *12 n.6. But the narcotic drug-controlled substance mismatch issue was not presented to the *Pascual* panel. *See id.* Accordingly, the Second Circuit has not yet decided the question presented here. *See id.*

*States v. Townsend*, 897 F.3d 66, 74 (2d Cir. 2018). "With respect to controlled substances, that means the state law must criminalize only those substances that are criminalized under federal law." *Id.* "And because the analysis focuses on the 'controlled substance' element—not the specific controlled substance underlying the prior state conviction—'[the court] must presume that the conviction rested upon nothing more than the least of the acts criminalized' by the state statute." *Id.* (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013)); *see also Harbin*, 860 F.3d at 64. Accordingly, "[t]he relevant inquiry . . . focuse[s] on whether the state statute under which the alien was convicted covered federally controlled substances as defined in the CSA Schedules and not others." *Doe*, 886 F.3d at 207-08.

Here, that inquiry focuses on whether a "narcotic drug" under N.Y.P.L. §§ 220.16(1) and 110.00, 220.39(1) categorically matches the CSA's definition of a "controlled substance," as incorporated within the relevant aggravated felony definition. *See Townsend*, 897 F.3d at 74; *Swinton*, 495 F. Supp. 3d at 205 ("[A]pplying *Townsend*, the categorical approach must be used and the inquiry is limited to whether a 'narcotic drug' under N.Y.P.L. § 220.39(1) is a categorical match with the CSA's definition.").

>    c.   *Categorical Mismatch between "narcotic drug" under N.Y.P.L. §§ 220.16(1) and 110.00, 220.39(1) and "controlled substance" under the CSA*

The question is whether the New York statute criminalizes certain "isomers" of cocaine that the CSA does not. It does.

"Isomers are molecules that share the same chemical formula but have their atoms connected differently, or arranged differently in space." *United States v. Phifer*, 909 F.3d 372, 376 (11th Cir. 2018). There are numerous types and subtypes of isomers. Using

the language of the CSA, the relevant isomer types include optical, geometric, and positional isomers. (*See* Report of Dr. Gregory B. Dudley, Ph.D. ("Dr. Dudley Report") (Dkt. 22-1) at ECF pp. 2-5.)

According to Defendant's expert Dr. Gregory Dudley, the CSA's isomer terms (*i.e.*, optical, geometric, and positional) are disfavored in modern chemistry. (*See id.* at ECF pp. 2-5.) Optical and geometric isomers are more accurately defined as subtypes of "stereoisomers"; positional isomers are more accurately described as a subset of "constitutional isomers." (*Id.* at ECF pp. 4-5.) Dr. Dudley asserts that cocaine has stereoisomers and constitutional isomers, but not positional isomers. (*Id.* at ECF p. 5 ("Isomers of cocaine that are not among its 'optical and geometric isomers' include its constitutional isomers.").) By contrast, the Government and Holmes assume that positional isomers of cocaine exist. (*See* Opp. at 16 & n.6; Def.'s Reply at 13 & n.11.) All this chemistry can get confusing. But the basic point, confirmed by Dr. Dudley and the parties, is clear: cocaine includes stereoisomers (*i.e.*, optical and geometric isomers) *and* non-optical, non-geometric isomers (*e.g.*, constitutional and positional isomers).

At the time of Holmes's 1992 and 1999 convictions, cocaine was (and is) a "narcotic drug," defined under New York law as:

> Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances including cocaine and ecgonine, their salts, isomers, and salts of isomers, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.

N.Y. Pub. Health L. § 3306, sch. II (b)(4).

At the same time, cocaine was (and is) listed as a "controlled substance," defined under the CSA as:

> Coca leaves and any salt, compound, derivative or preparation of coca leaves (including cocaine and ecgonine and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.

21 C.F.R. § 1308.12(b)(4); *see Doe*, 886 F.3d at 208 (comparing the state drug schedule against the CSA Schedules "in force at the time of the alien's conviction").

New York does not define "isomer" in its definition of cocaine. *See* N.Y. Pub. Health L. § 3306, sch. II (b)(4). In contrast, the CSA limits "isomer," as used in the definition of cocaine, to "any optical or geometric isomer." 21 C.F.R. § 1300.01(b). Thus, whereas the CSA covers only optical and geometric cocaine isomers, the New York statute covers non-geometric, non-optical cocaine isomers not controlled by federal law (*e.g.*, constitutional and positional isomers). On its face then, the New York statute is categorically broader than the federal definition. *See Gutierrez-Campos*, 2022 WL 281582, at *12-14 ("[B]y its terms, New York's definition of cocaine covers isomers of cocaine other than optical and geometric, including positional isomers and other isomers.").

Positional isomers of cocaine are apparently rare in the drug trade, *see United States v. Ruth*, 966 F.3d 642, 648 (7th Cir. 2020), because they must be synthesized in laboratory, *see* F. Ivy Carroll *et al.*, *Cocaine Receptor: Biochemical Characterization and Structure-Activity Relationships of Cocaine Analogues at the Dopamine Transporter*, 35 J. of Medicinal Chemistry 969, 969 (1992).

16

But they *do* chemically exist and were known to exist when the New York Legislature added the term "isomers" to the definition of cocaine in 1978. (*See* Opp. at 16, 22 (citing Robert L. Clarke & Sol J. Daum, β-Cocaine, 18 J. of Medicinal Chemistry 102, 102-103 (1975)).) That ends the matter, because a plain reading of the New York statute covers "isomers" of cocaine without limitation including non-optical, non-geometric isomers of cocaine not covered in the CSA. *See People v. Burnett*, 245 A.D.2d 460, 460 (2d Dep't 1997) ("[A] controlled substance under Schedule II of Public Health Law § 3306 includes *cocaine and all of its isomers*." (emphasis added)); *cf. United States v. Rodriguez-Gamboa*, 972 F.3d 1148, 1154-55 (9th Cir. 2020) (explaining that California prohibits both geometric and optical isomers of methamphetamine, and the CSA prohibits only optical isomers of methamphetamine, yet holding that the California statute was *not* overbroad, because "geometric isomers of methamphetamine do not chemically exist").

As this court previously explained in *United States v. Fernandez-Taveras*, the legislative intent and purpose of the New York amendment to cover "isomers" confirms what the text makes plain:

> The Public Health Law's definition of cocaine was adopted in 1978. [*See* Bill Jacket, L. 1978, ch. 100 ("Bill Jacket") (Dkt. 15-4) at ECF p. 7.] According to the Sponsor's Memorandum in support of that bill, "[t]he question of whether [dextro isomer cocaine and levo isomer cocaine] are chemically equivalent is the source of the present controversy" and the bill's purpose was to address "the difficulty in distinguishing between isomers of cocaine." [Bill Jacket at ECF p. 12.] To remedy that problem, the Legislature intended to close "the statutory loophole . . . by enacting this amendment which would include *all isomers of cocaine* and ecgonine in the schedule of controlled substances." [*Id.* (emphasis added)].

17

*See also People v. Burnett*, 245 A.D.2d 460, 666 N.Y.S.2d 658 (2d Dep't 1997) ("[A] controlled substance under Schedule II of Public Health Law § 3306 includes cocaine and all of its isomers. Hence, upon the forensic chemist's conclusion that cocaine was present in the substance tested, there was no need for additional testing to ascertain whether the substance was L-cocaine or D-cocaine.")

. . . .

The New York Legislature made a [] policy choice to define cocaine as broadly as possible, including all isomers. The Legislature implemented that policy for two reasons: (1) to ease the financial burden on police laboratories that would need to purchase expensive equipment to differentiate between different isomers of cocaine; and (2) to avoid risk that any legalized form of cocaine might pose to the public. [*See* Bill Jacket at ECF p. 12.] As a result of the difference in the definitions of cocaine under New York law and federal law, possession of certain cocaine isomers is illegal under the New York statute but legal under the CSA.

511 F. Supp. 3d 367, 373-74 (E.D.N.Y. 2021).[6]

---

[6] Following *Fernandez-Taverez* at least six other district courts in this circuit have reached the same conclusion: "Isomers" of cocaine under New York law is broader than "isomers" of cocaine under the federal law. *See Gutierrez-Campos*, 2022 WL 281582, at *12-14; Order Setting Forth Statement of Reasons for Sentence, *United States v. Louissaint*, No. 20-CR-685 (PKC) (S.D.N.Y. Nov. 17, 2021) (Ex. 2 to Def.'s Supp. Auth. Letter (Dkt. 23-2).); Tr. at 25-26, *United States v. Minter*, No. 20-CR-389 (JGK) (S.D.N.Y. Oct. 12, 2021) (Ex. Q to Wheeler Decl. (Dkt. 22-1) at ECF 121-22) ("[W]hy is it so absurd to think that the New York State Legislature, as a matter of convenience or whatever, decided to throw its net widely[?]"); Tr. at 45-46, *United States v. Ferrer*, No. 20-CR-650 (NRB) (S.D.N.Y. Jul. 21, 2021) (Dkt. 25); Tr. at 6-11, *United States v. Baez-Medina*, No. 20-CR-24 (JGK) (S.D.N.Y. July 1, 2021) (Dkt. 50).

The Government contends "isomers" has a specific meaning, because "it was widely understood, and frequently stated and restated by state and federal courts, that cocaine has eight isomers: cocaine (l-cocaine or levo-cocaine or natural cocaine) and seven stereoisomers." (Opp. at 17-18 (collecting cases).) This eight-isomer reading, the Government says, has the added benefit of avoiding an interpretation that would render the New York statute "exceptionally overbroad" to the point of absurdity, because the formula for cocaine, C17H21NO4, produces some thousands of "isomers" of cocaine. (*Id.* at 19-20 & n.9.)

The Government fails to reckon with the purpose of the New York statute. The two-page string cite the Government uses to support its eight-isomer interpretation has little value. No case considers Schedule II of New York's Public Health Law § 3306, and all arise in the context of the so-called cocaine isomer defense: "a sophisticated scientific defense grounded in the chemistry of cocaine," *United States v. Ross*, 719 F.2d 615, 617 (2d Cir. 1983), which rests on the premise that of the eight isomers of cocaine only L-cocaine represents an illegal form of the drug and, absent a polarimeter test, government testing procedures cannot conclusively determine whether cocaine is L-cocaine, *see United States v. Bockius*, 564 F.2d 1193, 1194 (5th Cir. 1977). The thrust of the isomer defense is that, absent this costly test,[7] the government simply could not prove beyond a reasonable doubt that a defendant's cocaine was L-cocaine (*i.e.*, illegal cocaine), and not some other stereoisomer of cocaine (*i.e.*, legal cocaine, according to that defense). But the isomer defense embodies the very "statutory loophole" that New York sought to close. (Bill Jacket at ECF p. 12.) Rather than force prosecutors

---

[7] As the New York Legislature explained, a polarimeter sold "for approximately $12,000.00," with "limited laboratory utility" to reconcile that financial burden. (Bill Jacket at ECF p. 12.)

(and courts) to contend with the technical, chemistry-based arguments germane to this defense—or to "[e]xpos[e] the public to the risks entailed by a legalized form of cocaine"—New York amended the statute to "include all isomers of cocaine." (*Id.*) All isomers of cocaine means all isomers: optical, geometric, and positional; or, alternatively, stereoisomers and constitutional isomers. Problem solved. *Cf. Burnett*, 245 A.D.2d at 460 ("Hence, upon the forensic chemist's conclusion that cocaine was present in the substance tested, there was no need for additional testing to ascertain whether the substance was L-cocaine or D-cocaine.").

The Government's eight-isomer reading and absurdity-by-overbreadth argument are undermined by the fact that New York was (and is) not the only state to define "isomers" of cocaine broadly. Others specifically include positional isomers in the definition for cocaine. *See, e.g.*, 720 Ill. Comp. Stat. Ann. 570/206(b)(4); Tex. Health & Safety Code Ann. § 481.102(3)(D). The court doubts the eight-isomer reading could have been so "widely understood," when Illinois and Texas intentionally decided to include positional isomers in their drug schedules.[8] In any case, the Government directs its overbreadth argument to the wrong audience. Judges are not legislators, and the court must give effect to the law as written: "It is not the province of the judiciary

---

[8] In Illinois, the legislature added the word "isomer" to the definition of cocaine and amended the statute a year later to expressly identify optical, positional, and geometric isomers. *See Ruth*, 966 F.3d at 648. In other words, "it was far from a potential drafting oversight." *Id.* "Illinois went from generically prohibiting 'isomers' to expressly identifying the precise types of cocaine isomers it sought to proscribe," and it did so in 1985 *after* the CSA added its geometric and optical-only definition for isomers of cocaine. *Id.*; *cf.* Dangerous Drug Diversion Control Act of 1984, Pub.L. 98-73, 98 Stat. 1837.

to rewrite [New York's] statute to conform to a supposed practical understanding of the drug trade." *See Ruth*, 966 F.3d at 648. Here, the text, purpose, and legislative history of the New York statute all point in one direction: "isomers" of cocaine means all isomers.

The Government also contends that a consistent reading of the term "isomers" in § 3306 "shows conclusively that the term . . . did not encompass position isomers of cocaine." (Opp. at 22.) The Government relies on the 1977 pre-amendment version of § 3306, which defines many controlled substances and their "isomers." (*See* Ex. 2 to Opp. ("N.Y. Pub. Health L. § 3306 (McKinney 1977)") (Dkt. 20-2).) In particular, the Government counts 81 uses of the term "isomers." Of those 81, three provisions cover "isomers," followed by a parenthetical: "isomers (whether optical, position, or geometric)." *See id.* § 3306, sch. III(d), IV(c), (d). According to the Government, this shows that "[b]y 1978, the New York legislature clearly knew how to include position isomers within the definition of a controlled substance," therefore, "[i]f it had intended to include position isomers within the definition of cocaine, it could have done so." (Opp. at 22.)

Applying a "whole code" argument to a dynamic drug schedule like N.Y. Pub. Health L. § 3306 is of questionable utility.[9] Putting this doubt aside, here, the Government reads far too much into three parentheticals located in different drug Schedules than cocaine.[10] Even accepting its premise, however, the proposed interpretation would render the statute unreadable for several reasons.

---

[9] Of even less utility to the court's interpretation is the Government's legislative inaction argument.

[10] If anything, these parentheticals are explanatory. They establish that "isomers" alone includes "isomers (whether optical, position, or geometric)."

First, it assumes that New York added "isomers" to its definition of cocaine as a term of art: that of the 81 uses of "isomers," the New York Legislature, without any explanation, intended "isomers" of cocaine to mean *only* those eight stereoisomers. Thus, somewhat ironically, the Government's consistency argument offers a wholly inconsistent reading of "isomers" of cocaine among the 81 other uses of that term. The court rejects this tortured reading of the statute.

Second, this interpretation also fails under a plain reading of the statute because it would mean that "isomers" covers *only* optical and geometric isomers, *except when* followed by the parenthetical "(whether optical, position, or geometric)." Again, though, the Government offers no principle to limit that reading to "isomers" of cocaine. Nor, for that matter, does it offer any reason why isomers-sans-parenthetical means only geometric and optical isomers, rather than some other combination of isomers. This reading, like the eight-isomer-term-of-art reading, would put the meaning of "isomers" in flux throughout the statute.

Finally, elsewhere in the statute, and contrary to the Government's position, a full reading of § 3306 pre-amendment also supports a broad reading of "isomers" of cocaine. Section 3306 Sch. II(c)(1) covers "Amphetamine, its salts, *optical isomers*, and salts of optical isomers." N.Y. Pub. Health L. § 3306, sch. II(c)(1) (McKinney 1977) (emphasis added). This definition (in the same Schedule as cocaine) shows that the New York Legislature viewed "isomers" broadly, and it knew how to limit it to cover only one or two types of isomers, when it determined appropriate.

*       *       *

22

When defined without limitation, "isomers" refers to isomers that chemically exist. Optical and geometric isomers, as well as non-optical, non-geometric isomers (*e.g.*, constitutional and positional isomers) of cocaine exist. New York law covers "isomers" of cocaine. Thus, New York law covers non-optical, non-geometric isomers in its definition of isomers of cocaine, whereas the CSA does not. As a result, there is a categorical mismatch between "narcotic drug" under N.Y.P.L. §§ 220.16(1) and 110.00, 220.39(1) and "controlled substance" under the CSA.

Because of this categorical mismatch, Holmes's underlying convictions are not aggravated felonies within the meaning of the INA. *See* 8 U.S.C. § 1101(a)(43)(B). The IJ misinformed Holmes that his convictions made him ineligible for relief from removal by voluntary departure and precluded him from seeking such relief. In doing so, the IJ committed a fundamental error that violated Holmes's rights in the proceeding because "a failure to advise [or to misadvise] a potential deportee of a right to seek . . . relief can, *if prejudicial*, be fundamentally unfair within the meaning of Section 1326(d)(3)." *United States v. Nunez*, 375 F. Supp. 3d 232, 242 (E.D.N.Y. 2018) (emphasis added); *see Calderon*, 391 F.3d at 374-75; *Gutierrez-Campos*, 2022 WL 281582, at *11 ("[A]n immigration judge's failure to inform an eligible noncitizen of the availability of voluntary departure can constitute a fundamental procedural error").

Accordingly, having satisfied the first step of showing fundamental unfairness, the court must determine whether that error translates to fundamental unfairness because of the prejudice it caused Holmes.

### 2.    Prejudice

"Prejudice is shown where there is a reasonable probability that, but for the error, the result of the proceeding would have been different." *United States v. Daley*, 702 F.3d 96, 100 (2d Cir. 2012). "[A] reasonable probability is a probability sufficient to

undermine confidence in the outcome." *United States v. Lopez*, 445 F.3d 90, 100 & n.7 (2d Cir. 2006) (comparing the test for prejudice to the test for ineffective assistance of counsel claims); *see United States v. Brown*, 354 F. Supp. 3d 362, 371 (S.D.N.Y. 2018) (quantifying reasonable possibility as a twenty-percent chance); *United States v. Copeland*, 369 F. Supp. 2d 275, 287-88 (E.D.N.Y. 2005) (Weinstein, *J.*) (same), *aff'd*, 232 F. App'x 72 (2d Cir. 2007).

Holmes demonstrates that prejudice resulted from the IJ's error, because but for that error, there is a reasonable probability that the IJ would have exercised his discretion and granted Holmes relief from removal by voluntary departure. The record establishes that Holmes sought relief from removal at his hearings. (*See* Removal Hr'g, Tape 1 at 7:32 ("This man want to know what kind of waiver this man here got."); *id.* at 8:11 ("All my family is here. My wife, my kids, and everybody's here. This man want to know what kind of rights he got, what kind of waiver, what kind of rights he got."); *id.* at 18:20 (requesting immediate removal on the assumption that he's "not eligible for no bail or nothing"); *id.* at 13:45-14:13 (same).) Thus, correctly informed of the law, Holmes would likely have requested relief by voluntary departure. The record further establishes a reasonable probability that the IJ would have granted Holmes such relief by voluntary departure—a discretionary form of relief used liberally at the time of his removal, *see, e.g.*, *Mukasey*, 554 U.S. at 8 (noting that of the 42 million aliens granted voluntary departure between 1927 and 2005, "almost 13 million of those departures occurred between 1996 and 2005 alone")—if only the IJ realized that Holmes's underlying state convictions did not constitute aggravated felonies. Each time the IJ denied Holmes relief from removal, the IJ tethered his explanation exclusively to the conclusion that Holmes's state convictions constituted aggravated felonies. (*See id.* at 9:21 - 10:08 (explaining to Holmes that "there

24

would be absolutely no relief for [a final drug conviction] because that is considered to be an 'aggravated felony'"); *id.* at Tape 2, 01:48 - 03:03 ("Since the respondent, for relief purposes, is considered an aggravated felon, he would be statutorily ineligible for any form of relief from removal." (citing Section 240B of the INA, 8 U.S.C. § 1229c, the voluntary departure provision)); *id.* at 5:52 - 6:13 ("I have found that because of your drug convictions . . . there is no relief which is available to you.").)

Accordingly, but for the IJ's erroneous conclusion of law, there is a reasonable probability that the proceeding would have been different: Holmes would have requested voluntary departure, and the IJ would have granted Holmes that relief, because Holmes, a longtime U.S. resident, and the spouse, son, and father of U.S. citizens, maintained a significant interest in the ability to lawfully immigrate to the United States. *See In re Arguelles-Campos*, 22 I. & N. Dec. 811, 819-20 (BIA 1999) (en banc) ("Congress contemplated that the Immigration Judges would have broad authority to grant voluntary departure before the conclusion of removal proceedings to assist in promptly bringing cases to conclusion. Such authority can be generously applied."); *cf. Brown*, 354 F. Supp. 3d at 373 (holding that defendant demonstrated a reasonable probability of winning voluntary departure relief, despite drug sale conviction, where he had resided here for over fifteen years; had strong family ties; and had not "previously violated any immigration laws, apart from his initial entry into the United States"). Indeed, the IJ recognized Holmes's interest during the removal hearing, finding that his state convictions foreclosed any available relief, "even though you have a wife and four children in the United States." (*Id.* at Tape 2, 5:52 - 6:13.) And unlike administrative removal, voluntary departure would have permitted Holmes the ability to presently visit his wife and four children. These interests—Holmes's longstanding residency and significant familial ties—outweigh the adverse fact of Holmes's state convictions.

The Government contends that, "even if this Court concludes that the defendant's convictions under New York law were not aggravated felonies under the INA—there is no cognizable basis—let alone reasonable likelihood—to find that he would not have been removed from the United States." (Opp. at 25.) That's because, "[i]n 2000, there was no question that a conviction under New York law for a cocaine offense constituted an aggravated felony for purposes of the INA." (*Id.*) This argument is without merit. In 2000 (as today), New York law covered cocaine isomers not covered in the CSA; thus, in 2000 (as today), Holmes's convictions would not constitute aggravated felonies. Therefore, Holmes was eligible for an opportunity for relief from removal by way of voluntary departure. Moreover, errors are to be assessed from the vantage point of present-day authority: "Second Circuit precedent establishes that the court must determine whether or not . . . an error was made with the advantage of hindsight," including an error "erroneously categorizing a deportee's offense of conviction as an aggravated felony." *United States v. Pineda*, No. 18-CR-523 (NGG), 2020 WL 5981901, at *6 (E.D.N.Y. Oct. 8, 2020).

The issue is not whether Holmes would have been removed from the United States; the issue is whether he would have been afforded voluntary departure. And, given his longstanding residency in the United States, his family ties, and the IJ's statements, there is a reasonable probability that, but for the IJ's erroneous conclusion that his prior convictions were aggravated felonies, Holmes would likely have been afforded such relief. Accordingly, Holmes satisfies step two of the fundamental unfairness test and establishes the third factor of § 1326(d).

### B.   Section 1326(d)(1): Administrative Exhaustion

Holmes did not exhaust his administrative remedies. But the administrative exhaustion requirement is excused when the defendant's waiver of his right to an administrative appeal was

not knowing and intelligent. *See Calderon*, 391 F.3d at 374-75. "[A] waiver is not voluntary, knowing, and intelligent when the IJ fails to explain to the defendant the consequences of the waiver or, where a defendant has a clearly established right to be informed about possible routes for challenging deportation, when the IJ fails to state the grounds for appeal the defendant might have." *Ramos de la Rosa*, 2021 WL 2784610, at *2. "Given . . . that many aliens are uncounseled, our removal system relies on IJs to explain the law accurately to *pro se* aliens. Otherwise, such aliens would have no way of knowing what information was relevant to their cases and would be practically foreclosed from making a case against removal." *Copeland*, 376 F.3d at 71.

Holmes has established that his waiver of his right to administrative appeal was not knowing and intelligent. The IJ told Holmes in no uncertain terms that, if he had a drug conviction, "there would be absolutely no relief for you because that is considered to be an 'aggravated felony.'" (Removal Hr'g, Tape 1 at 9:21 - 10:08; *see also id.* at Tape 2, 01:48 - 03:03 ("Since the respondent, for relief purposes, is considered an aggravated felon, he would be statutorily ineligible for any form of relief from removal."); *id.* at 5:52 - 6:13 ("[B]ecause of your drug convictions . . . there is no relief which is available to you").) Only after the IJ crushed Holmes's hope for relief did Holmes waive his right to appeal—a waiver predicated on the IJ's erroneous instruction, motivated by Holmes's desire to expedite a removal in which he believed "absolutely no relief" was available to him.

The Government argues that Holmes cannot establish administrative exhaustion because he repeatedly asked to conclude proceedings to expedite removal and the IJ accurately informed him about his right to appeal and the effect of his waiver. But this ignores that Holmes's understanding of that right and his subsequent waiver rested on the false premise that he was an

aggravated felon foreclosed from relief. With that understanding, evident from the hearings, Holmes sought immediate removal to avoid remaining in custody, pending removal.

Accordingly, Holmes's waiver of his right to an administrative appeal was not knowing and intelligent, and the administrative exhaustion requirement is excused.[11]

### C. Section 1326(d)(2): Opportunity for Judicial Review

The Government concedes that the 35 days between the issuance of the removal order and removal deprived Holmes of that review. The court agrees. Therefore, Holmes has satisfied the second requirement under § 1326(d). *See* 18 U.S.C. § 1326(d)(2) (deprivation of opportunity for judicial review); *Calderon*, 391 F. 3d at 376 (finding no realistic possibility of seeking judicial review because defendant was deported 42 days after entry of final removal order).

*       *       *

---

[11] Holmes also challenged the jurisdiction of the immigration court based on the allegedly defective Notice to Appear, which lacked (1) the date and time, and (2) the address of the removal hearing. To make this challenge, however, Holmes must still satisfy the § 1326(d) factors. *See Palomar-Santiago*, 141 S. Ct. at 1620-21; *United States v. Benitez-Dominguez*, 440 F. Supp. 3d 202, 206 (E.D.N.Y. 2020). Here, the IJ informed Holmes of the right to appeal and made clear that by waiving this right he would be consenting to final judgment. Holmes's unknowing and unintelligent waiver of the "aggravated felony" argument (based on the IJ's fundamental procedural error of law) does not extend to these separate jurisdictional arguments. Thus, Holmes made a knowing and intelligent waiver of his jurisdictional arguments, and he cannot satisfy § 1326(d)'s requisite administrative exhaustion requirement. *See* 18 U.S.C. § 1326(d)(1).

The court has found that Holmes (1) is excused from satisfying the administrative exhaustion requirement, (2) was deprived of his opportunity for judicial review, and (3) had a fundamentally unfair removal hearing. Therefore, Holmes satisfies each requirement under 8 U.S.C. § 1326(d), rendering the underlying removal order invalid.

## IV.  CONCLUSION

Because Defendant George Holmes's underlying deportation order is invalid, the Government cannot satisfy an element of count one § 1326(a) of this single-count Indictment. Thus, Holmes's Motion to Dismiss the Indictment (Dkt. 15) is GRANTED and the Indictment is DISMISSED.

SO ORDERED.

Dated:      Brooklyn, New York
            April 6, 2022

                                    /s/ Nicholas G. Garaufis
                                   NICHOLAS G. GARAUFIS
                                   United States District Judge